William J. SAN FELICE

v.

UNITED STATES of America (Matthew Leivo & Sons, Inc., Third-Party Defendant).

Fred MUSONE

v.

UNITED STATES of America (Matthew Leivo & Sons, Inc., Third-Party Defendant).

Civ. A. Nos. 9917, 9918.

United States District Court
W. D. Pennsylvania.

May 12, 1958.

Dennis Harrington, James P. McArdle, Pittsburgh, Pa., for plaintiffs.

Hubert I. Tietelbaum, U. S. Atty., Thomas J. Shannon, Asst. U. S. Atty., Pittsburgh, Pa., for the United States.

V. C. Short, Pittsburgh, Pa., for Matthew Leivo & Sons, Inc.

GOURLEY, Chief Judge.

In these actions under the Federal Tort Claims Act, Fred Musone and William J. San Felice claim damages from the United States of America based on injuries sustained in an accident on October 13, 1949. 28 U.S.C.A. §§ 1346 and 2671 et seq.

The United States of America has brought upon the record as third-party defendant, Matthew Leivo & Sons, Inc., independent contractor by whom plaintiffs were employed when the accident occurred, claiming it to be solely or jointly liable for the damages sustained by each plaintiff.

To simplify references to names and for purpose of brevity, the following abbreviations shall be employed:

| | |
|---|---|
| Fred Musone | – Musone |
| William J. San Felice | – Felice |
| United States of America | – United States |
| Matthew Leivo & Sons, Inc. | – Matthew |
| Keystone Ordnance Works | – Keystone |
| Fraser-Brace Company | – Fraser |
| Youngstown Kitchen Division of the American Radiator and Sanitary Corp. | – Youngstown |

The plaintiffs were injured while working for Matthew in dismantling a valve at Keystone.

Historically, Keystone comprised many thousand acres and innumerable buildings used in the production of an explosive known as T.N.T., and upon fulfillment of defense requirements, Fraser, which operated the plant during the production of the explosives, was given the further assignment of decontaminating the buildings and equipment.

Among the equipment decontaminated were fifty cast iron valves. To identify the degree of decontamination, as provided by government decontamination procedures, five X's, indicating that the material was entirely safe for general use, had been placed upon the valve which exploded injuring both plaintiffs.

Plaintiffs predicate liability upon two theories:

1. That United States, as a possessor of land, failed to make a reasonable inspection to learn of the dangers attendant on the work in progress at Keystone and failed to warn plaintiffs of those dangers.

2. That in spite of the written contract between United States and Matthew, defendant United States retained control of the work in progress at Keystone and/or so supervised performance of the job then being done as to have assumed control, and failed to exercise that control with reasonable care.

Upon a most thorough review of the testimony and the inferences to be drawn therefrom, and in evaluating inconsistencies and contradictions evinced in testimony of the various witnesses, and from direct personal observation of the demeanor, expression and forthrightness of witnesses, it is my judgment that the accident was due to the joint negligence of United States and Matthew.

Section 1346(b), 28 U.S.C.A., provides that liability shall attach to the United States under circumstances where a private person would be liable to the claimant in accordance with the law of the place where the act or omission oc-curred. Therefore, the substantive law of Pennsylvania must govern.

Although an employer is not generally liable for the negligence of an independent contractor, nevertheless, the possessor of land who employs an independent contractor with respect to known or discoverable dangerous conditions existing on the premises where the work is to be done, owes the duty to warn the contractor of their existence. Engle v. Reider, 366 Pa. 411, 77 A.2d 621. Furthermore, said possessor owes to an independent contractor and his servants at work on said property a duty of exercising reasonable care to have the premises in a safe condition for the work, unless the defects responsible for the injury were known to the contractor. Newingham v. J. C. Blair Co., 232 Pa. 511, 81 A. 556; Restatement of Torts, Section 343.

Upon a most complete appraisal of the evidence, I must conclude that United States failed to advise Matthew with any degree of exactness as to the hazards and hidden dangers that were known or should have been known to United States, and which were unobservable upon inspection.

In addition even if the court were in error in so concluding, another cogent reason exists upon which the liability of United States must be fastened. It is apparent that where the employer has retained some element of control of the job, he should be responsible for the harmful consequence of its performance as a concomitant of the control retained. Spinozzi v. E. J. Lavino & Company, 3 Cir., 243 F.2d 80; Pender v. Raggs, 178 Pa. 337, 35 A. 1135; Stork v. City of Philadelphia, 199 Pa. 462, 49 A. 236; McGrath v. Pennsylvania Sugar Co., 282 Pa. 265, 127 A. 780.

The evidence supports the conclusion that United States was at all times the possessor of the land by and through its construction engineer, maintained control of all areas of Keystone and directed the work to be done and the manner in which it was to be accomplished. That said direction and control was negligently exercised and was the proximate cause in

bringing about plaintiffs' injuries. I am further satisfied that the negligent conduct of Matthew in failing to conduct a more assiduous investigation and intensive inquiry from United States engineers in view of the extrahazardous nature of the work to be conducted, was the concurrent contributing factor in the resulting explosion and accident.

Defendants' contention that plaintiffs were guilty of contributory negligence for the reason that they employed torches and hammers in their effort to dismantle the valve is without merit. An employee is not contributorily negligent in relying on the representations made to him instead of concluding his own independent investigation. Robb v. Gylock Corporation, 384 Pa. 209, 120 A.2d 174.

I must conclude, therefore, that plaintiffs, being free of contributory negligence, are entitled to recover for the negligent conduct of duly authorized servants and representatives of United States while acting within the scope of their authority and employment. The United States is entitled to recover from Matthew, by way of contribution, in accordance with the law of Pennsylvania.

### Damages

Musone, one of the plaintiffs, as a consequence of the accident, suffered fracture of his left knee, injury to the cervical area of the spine, damage to the musculature and other soft tissue in both shoulders, traumatic amputation of the right thumb, traumatic perforation of the right eardrum, laceration of the left hip, and hernia involvement.

Fracture of the left knee resulted in some residual disability. Fracture of the right arm required surgical correction and the use of wire, and the sloughing of skin from the right hand. Numerous minor operations to remove shrapnel resulting from the explosion were required immediately after the accident. The entire right thumb of the right hand down to the ball of the hand has been removed, with the inevitable accompanying disability which the loss of this member necessarily entails. In addition, he experienced a loss of sensitivity in the left forearm and hand, so that it was demonstrated that the plaintiff could feel no pain from the tips of two fingers to a point well up to the wrist of the left hand. At the left hip, Plaintiff Musone continues to wear a scar eight inches and walks with a limp resulting from the loss of flexion of the soft tissues in the scarred area. Surgery was also performed for the hernia involvement and in an effort to improve the condition of the left hand.

In addition to the extreme pain which Musone experienced consequent to his injuries, the amputation of his thumb, and his confinement to Meadville City Hospital on three separate occasions for surgery and treatment, as well as to the Mercy Hospital in Pittsburgh, he was unable to work for twenty-five months as the proximate result of the accident.

In view of Musone's employment by Youngstown from December 31, 1951 until February 15, 1957, during which period he worked regularly as a millwright or laborer, performing heavy labor, it appears that Musone has made substantial recovery.

San Felice, the other plaintiff, sustained extensive contusions and lacerated injuries of the right hand and forearm, and first and second degree burns of the face and upper extremities. Portions of his flexor muscles had been removed as a consequence of the explosion, which resulted in a macerated type of laceration causing a severe scar extending from the elbow to the wrist of the right arm, resulting in 30% residual disability of the use of the right arm.

He experienced protracted and extensive pain, some of which, in various regions of the body, lasted for three and four years.

In addition to the facts set forth in the above discussion, the following are entered:

### Findings of Fact

1. This is an action for damages in which the plaintiffs, Musone and Felice,

each claims he was injured through the negligence of United States on October 13, 1949.

2. Plaintiffs are both residents and citizens of the Commonwealth of Pennsylvania and the United States of America.

3. United States is the defendant.

4. Jurisdiction of the United States District Court is conferred by the provisions of the Federal Tort Claims Act, 28 U.S.C.A. Section 1346 [2671] et seq.

5. United States, after suit, joined Matthew as a third-party defendant, charging said party to be solely or jointly and severally liable for the injuries and damages sustained by the plaintiffs.

6. Keystone, near Meadville, Pennsylvania, is a vast government owned operation, built and maintained among other things to produce T.N.T. for use of the Armed Forces of the United States. The Ordnance Works was activated in 1942.

7. From the date of its first activation in October, 1942, Keystone was operated under a contract of the type known as a Cost-plus Fixed Fee arrangement with Fraser as operating contractors. When the need for T.N.T. no longer existed, orders were issued by appropriate government agency to "decontaminate" Keystone.

8. Decontamination procedures ordered by the government demanded that all equipment, buildings, and even the ground, itself, which had been contaminated by contact with or proximity to, be washed, flushed, soaked, steamed, flashed or otherwise treated so as to rid the contaminated material of all traces of the explosive. The mixture was so dangerous that on occasion only total destruction would serve the purpose of decontamination. The T.N.T. area at Keystone had been decontaminated at least two times prior to 1949. The dates of decontamination were February, 1942 and September, 1945. Preston, Sr., a representative of the government, had participated in the decontamination procedure on both occasions. After a pipe,

valve, pump or any piece of equipment had been decontaminated, the extent of safety with which it could be handled was indicated by certain markings in the form of "X" marks painted on the equipment or "X's" marked on a card and wired on or tied to the piece. The code to indicate the degree of decontamination was as follows:

(1) X—A single X to indicate material only partially decontaminated. This marking is temporary and is to be followed by subsequent decontamination.

(2) XXX—Three X's to indicate that material has been examined and approved after decontamination either by boiling or steaming, but still should not be treated with open flame or high temperature heating devices and not to be considered toxically safe.

(3) XXXXX—Five X's to indicate that the material has been inspected after decontamination, is entirely safe, and may be released from the plant for general use.

In accordance with the above, all of the contaminated equipment was marked after it had been decontaminated. Markings were placed on the newly decontaminated equipment at the direction of United States. But employees of the government were aware that the markings placed on the decontaminated equipment were frequently in error.

9. Processing or placing in a stand-by condition was to be carried out by Matthew, a contracting firm hired by United States to decontaminate and process and reprocess Keystone, under the supervision and direction of the employees of United States.

"Processing" as it applied to valves included the following:

a. Government employees designated the valves to be processed.

b. Government employees designated the buildings in which the processing was to be done.

c. Trucks were sent in to areas designated by government employees and valves were collected and brought to the General Chemical Building.

d. Matthew employees opened the valves, discarded worn or defective parts, replaced missing parts, cleaned, oiled, re-assembled, classified and stored re-processed valves.

e. If a valve failed to come apart, it may have been steamed, soaked in acid, bathed in oakite, heated, cut or discarded.

10. Musone and Felice were working together in the General Chemical Building at the job of re-processing valves. In an effort to break down a valve, Felice applied heat from an acetylene torch to the valve and it exploded. Both Musone and Felice were seriously injured.

11. The valve which exploded was identified as a four-inch plug cock cast iron valve approximately eighteen inches in diameter and weighing approximately seventy-five pounds. The valve which exploded was one of a special class of twenty-four valves which had been used on "melt tanks". The valve was used to regulate the flow of T.N.T. It proved to be unsatisfactory for the purpose for which it was designed and originally used and was later replaced by another more suitable class of valves. The valve which exploded was used from October, 1942 until February or March of 1943, and was then discontinued on the recommendation of Preston, Sr., a government employee. The valve was one taken from the T.N.T. area. The valve was brought from the T.N.T. area on a truck the day prior to the explosion. Felice had worked on the valve and after finding himself unable to break it down put the valve in an acid bath at a regulated temperature and allowed it to remain there overnight. On the day of the explosion, plaintiffs and fellow employees had worked on the valve and attempted to open it. The valve which exploded had not been used for at least six and one-half years prior to the accident and was stored in a government warehouse. It had passed through two decontamination procedures and had been classified according to government regulations. It had been handled by Preston and/or his crew and had been processed by them. The valve was represented by the government to be safe, fully decontaminated, and was marked with five X's to indicate that the valve contained no dangerous explosive properties. However, the valve contained sufficient T.N.T. to explode and inflict severe damage. In this class of valves, fifty per cent were marked with five X's and when flashed at least half were found to contain enough T.N.T. to cause them to explode.

12. The government, through its agents and representatives, knew that the safety measures advocated by it were patently inadequate and that generally dangerous conditions existed in the entire area. T.N.T. was found in large quantities on the ground, in valves, and on the floor in the buildings. Under such circumstances, United States ordered, directed and supervised the processing and re-processing of equipment in the most haphazard manner and under extremely hazardous conditions.

13. United States approved and encouraged the use of an acetylene torch in the General Chemical Building which was a contaminated area. The torch used at time of accident was owned and provided by United States and had been stored in a government warehouse. No tools could be withdrawn from the government warehouse without the permission of a government employee. The torch was taken from the government warehouse and returned every night to said warehouse until it was moved into the General Chemical Building about two weeks before the explosion. Use of the torch in the General Chemical Building was approved by a government employee who had control over the torch. Prior to the explosion, the torch remained in use in the General Chemical Building for at least two weeks. During that time government representatives visited the General Chemical Building and observed the torch in use generally, and specifically used to cut and heat valves.

14. Even though the employees of Matthew were engaged in extrahazardous activity, little or no instructions were provided for the benefit of the plaintiffs or other employees who had never before

worked with T.N.T. No formal training was provided for the men working with T.N.T. Certain supervisory personnel were sent to training schools but no formal safety meetings were held, nor safety rules taught. No general or specific safety instructions were given concerning the handling of valves for processing or re-processing of contaminated equipment. Plaintiffs were directed to rely on the markings on all equipment, and instructed to rely on those markings when the defendant knew or should have known that the markings were deceiving and not as represented by the government.

15. United States was at all times possessor of the land, maintained control of all areas at Keystone and directed the work to be done and the manner in which it was to be accomplished. The government employee designated as construction engineer directed Matthew and its employees in the following manner:

a. Selected a training school in St. Louis and enforced the attendance of Matthew Supervisory Personnel.

b. Selected the areas in which work was to be done.

c. Directed individual employees of Matthew in the manner in which work was to be accomplished.

Control over the areas in which work was being done and the manner of its performance was also demonstrated in other ways—government employees were recognized as superior to Matthew employees in the outline and details of the performance of the work, had complete authority in directing Matthew crews. The decontamination, not processing, of the "Red Water House" was carried out under immediate supervision of the construction engineer. The government contract specifically provided for the use of all government tools when possible and United States employees maintained exclusive control over such tools as well as all electrical equipment. Access to the buildings in which work was being done was controlled by the government. After the explosion, the government further exercised control over the equipment and the premises by ordering destruction of the remaining dangerous valves.

The close government supervision and control of broad policy and minute detail was exercised in the field and at policy level meetings held periodically. Meetings were attended by government representatives and Matthew supervisors. At the meetings it was conceded that the highest government officer had final say in all problems and all action was deferred until express approval was obtained from the proper government representative.

16. Felice was born December 27, 1912, and was at the time of trial 44 years of age, and was in good health prior to the accident. He was hired by Matthew at the Keystone job July 14, 1949, and was earning at the time of the accident $76 per week for a five-day week consisting of forty hours. Immediately after the accident, he was taken to Meadville City Hospital where he remained from October 13, 1949 to October 23, 1949. He was treated at the hospital by Dr. Amleto Acquaviva of 1112 South Mills Street, New Castle, Pennsylvania. At the time Dr. Acquaviva first examined Felice, he found that Felice had suffered extensive contusions and lacerated injuries of the right hand and forearm with generalized first and second degree burns of the face and upper extremities. He found that the laceration of the forearm was a contused type of laceration, portions of the flexor muscles had been removed by some object, which resulted in a macerated type of laceration. At the time of trial, Felice exhibited a scar extending from the elbow to the wrist on the right arm. This is a permanent scar and according to medical opinion results in a thirty percent residual disability of the use of the right arm.

Felice testified that the explosion resulted in terrific pain, like a shot-gun blast. A large red blood clot appeared around the complete circumference of his trunk and remained over some period of time. He testified extensively concerning pain across the back of his head, in the stomach and around his chest, and con-

tinued to experience pain in various regions of his body for three or four years.

17. The following damages were sustained by Felice which were the proximate result of the accident:

Medical:

| | | |
|---|---|---|
| Dr. W. K. Fisher | $23.00 | |
| Dr. Ewing | 5.00 | |
| Dr. Deissler | 175.00 | |
| Dr. A. Acquaviva | 832.50 | $ 1035.50 |

Hospital:

| | |
|---|---|
| Meadville City Hospital | 141.50 |

Nursing:

| | | |
|---|---|---|
| Dorothy B. Young | 80.00 | |
| Pearl Kurtz | 40.00 | |
| Evelyn Herdley | 48.00 | 168.00 |

| | |
|---|---|
| Loss of wages: | |
| From Oct. 13 to Nov. 17, 1949 | 380.00 |
| Impairment of earning power (reduced to present worth) | 3500.00 |
| Pain, suffering and inconvenience | 7000.00 |
| Total | $12225.00 |

18. Musone was 50 years of age at the time of trial and was born August 21, 1906. The injuries sustained in the accident of October 13, 1949 resulted in the following admissions: Admissions to Meadville City Hospital for treatment for the injuries sustained from October 13, 1949 to November 3, 1949, then again from January 10, 1950 to January 12, 1950, and from April 29, 1951 to May 3, 1951, and Mercy Hospital, Pittsburgh, from April 16, 1957 to May 7, 1957. As a result of the accident, Musone sustained a fracture of his left knee, an injury to the cervical area of the spine, damage to the musculature and other soft tissues in both shoulders, traumatic amputation of the right thumb, traumatic perforation of the right eardrum, deep lacerations about the left hip and a hernia.

Musone sustained a fracture of the left knee which has resulted in some permanent residual disability. He sustained such a fracture of the ulna of the right arm as to require surgical correction and X-rays continue to demonstrate wire present in the area. Shortly after the accident, there was a sloughing of skin of his right hand and it was swollen. On the right hand, the plaintiff, Musone, was required to submit to some ten to fifteen minor operations in order to remove the shrapnel resulting from the explosion. The entire right thumb of the right hand down to the ball of the hand has been removed. Musone sustained such damage to the nerves and musculature of the left forearm and hand as to result in a contracture of the fourth and fifth fingers thereon. By graphic demonstration of the senses of the loss of sensitivity in the area of the fourth and fifth fingers of the left hand, it was demonstrated that the plaintiff could feel no pain from the tips of those two fingers to a point well up to the wrist of the left hand, all resulting from the accident. At the left hip, plaintiff still wears a scar eight inches by an inch and a half by three-quarters inches, showing the area lacerated by flying shrapnel at the time of the explosion. Musone walks with a limp, which results from the loss of flexion of the soft tissues in the scarred area. He has and will have disability in

walking and this scar remains tender. X-rays showed a narrowing of the disc spaces at the level of C–2, 3, 4 with marked limitation indicating a bone damage which also in medical opinion resulted in residual back injury. Musone sustained such injuries to the soft tissue in his shoulders as to prevent him from exercising simple operations as removing and donning his underclothing with ease and such limitation will continue, and has in effect resulted in a ten percent loss of function in the shoulder area.

Musone was hired as a millwright at Keystone July 7, 1949, at the rate of $1.90 per hour. He was absent from his work over a period of twenty-five months from October 13, 1950, as a result of the accident.

The following damages were sustained by Musone which were the proximate result of the accident:

| Medical: | | | |
|---|---|---|---|
| | Dr. W. H. Fisher | $ 93.00 | |
| | Dr. Paul Pruvins | 70.50 | |
| | Dr. I. G. Davis | 35.00 | |
| | Dr. J. S. Clapp | 20.00 | |
| | Dr. C. W. Fortune | 78.98 | |
| | Drs. Deissler & Marshall | 534.50 | |
| | Dr. Blair Leech | 225.00 | |
| | Dr. P. A. Faix | 400.00 | $ 1456.98 |
| Hospital: | | | |
| | Meadville Hospital | $412.00 | |
| | Mercy Hospital | 480.45 | 892.45 |
| Nursing: | | | |
| | Dorothy B. Young | $170.00 | |
| | Pearl Kurtz | 40.00 | |
| | Evelyn Herdley | 48.00 | 258.00 |
| Loss of wages: | | | |
| | From Oct. 13, 1949 to Nov. 13, 1951 | | 7804.00 |
| Impairment of earning power (reduced to present worth) | | | 7500.00 |
| Pain, suffering and inconvenience (past, present and future) | | | 15000.00 |
| Total | | | $32911.43 |

### Conclusions of Law

1. This court has jurisdiction of these actions under the Federal Tort Claims Act, 28 U.S.C.A. Section 1346(b).

2. The proximate cause of plaintiffs' injuries was due to the concurring negligence of United States and Matthew.

3. Plaintiffs were not guilty of contributory negligence.

4. Under all the law and the evidence, judgment should be entered in favor of Felice in the amount of $12,225.

5. Under all the law and the evidence, judgment should be entered in favor of Musone in the amount of $32,911.43.

6. Under all the law and the evidence, judgment should be entered against Matthew and in favor of United States in each instance in the amount to which said

Matthew is liable, pursuant to the provisions of the Pennsylvania Workmen's Compensation Act, 77 P.S. § 1 et seq. The plaintiffs shall be directed to enter a credit to the United States on each judgment in said amount.

An appropriate order is entered.